UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

United States of America,
        Plaintiff

        v.                                Case No. 08-cv-499-SM
                                          Opinion No. 2011 DNH 201
David M. Hulick and
Caroline P. Hulick,
        Defendants/
        Counterclaim Plaintiffs

and

State of New Hampshire
Department of Employment Security,
        Defendant

**O R D E R**

In 1997, the Secretary of the Treasury determined that
Precision Valley Aviation, Inc. ("Precision"), Northeast Express
Regional Airlines ("NERA"), and six other related airline service
companies had failed to pay over to the Internal Revenue Service
more than $500,000 in federal income taxes and F.I.C.A.
contributions they had withheld from employee paychecks in 1994.
Ten years later (as of October 31, 2007), the IRS calculated
that, with accrued interest, it was still owed more than $2
million in withholdings.  It now seeks to collect that amount
from the defendant, David Hulick.

At issue is not Hulick's payment or non-payment of <u>personal</u> income taxes.  Rather, this case involves his alleged individual liability for taxes withheld by his employers from employee wages.  The IRS determined that, because of the positions Hulick held at Precision and NERA (and/or one or more of the related companies), Hulick was personally responsible for paying over to the IRS taxes and F.I.C.A. contributions withheld by the companies.  Accordingly, the government looked to him, personally, for payment of those outstanding corporate obligations, plus continually accruing interest.

Approximately eleven years after making the assessments against Hulick, and following nearly two years of periodic payments by him, and after rejecting at least three settlement proposals by Hulick, the government brought suit against both Hulick and his wife seeking to: (a) reduce to judgment all unpaid tax liabilities for which the IRS claims he is personally responsible (known as trust fund recovery penalties); (b) establish the validity of federal tax liens levied against all property owned by Hulick; (c) foreclose the liens upon Hulick's family home in New Boston, New Hampshire (in which his wife has an interest); and (d) permit a judicial sale of that property. Hulick answered the government's complaint, denied liability, and

advanced several counterclaims (all but one of which were previously resolved against him).

The government now moves for summary judgment on all counts, saying there are no factual issues requiring a trial, and that it is entitled to judgment as a matter of law. The IRS also says it is entitled to dismissal of Hulick's sole remaining counterclaim. Hulick objects, and he also moves for summary judgment. For the reasons discussed below, the court concludes that genuinely disputed material facts preclude the entry of summary judgment in favor of either party. The government's motion to dismiss Hulick's counterclaim is also denied.

### Standard of Review

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported

by conflicting evidence." <u>Int'l Ass'n of Machinists and
Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196,
199-200 (1st Cir. 1996) (citations omitted).


### Background

Hulick began working for Precision in 1990, as its Vice
President and Chief Financial Officer.  He was an employee, but
not a director or shareholder.  Precision struggled financially
and on at least two occasions between 1992 and 1994 it failed to
make timely payroll tax payments to the IRS on behalf of its
employees.  Precision managed to later pay arrearages and
penalties in 1993, but failed to do so in 1994 before going out
of business.


Hulick notes that, because both Precision and NERA were
commercial airlines, when cash flow was restricted (due to
contingencies like higher fuel prices, reduced travel demand, and
weather-related flight cancellations), the companies focused
their attention and limited financial resources on maintaining a
safe fleet of aircraft.  <u>See, e.g.</u>, Hulick Deposition (documents
no. 48-4 thru 48-6) at 50 ("The companies were paying only those
creditors that were essential to the safe operation of the
airline.").  When cash flow improved (typically in the summer
months), the companies generally had sufficient assets to resolve

their outstanding obligations to creditors and the IRS (including late fees, fines, and penalties).  That is, until they went bankrupt before completely fulfilling those obligations.

Although Hulick says he did not actively participate in decisions to withhold tax payments due the IRS, he was aware of the companies' practice of doing so and "ensured that the owners were at all times aware of the amount and nature of the non-payment of taxes."  Amended Answer and Counterclaims (document no. 33) at para. 28.  Because of his position in Precision and NERA - Vice President of Finance - the IRS deemed Hulick to be a "responsible person" and assessed him for the unpaid payroll taxes.

The first assessment against Hulick was made on February 3, 1997, for the tax period ending on June 30, 1994.  And, six weeks later, on March 17, 1997, the second assessment was made, for the tax period ending on Sept. 30, 1994.  Each assessment was subject to a collection limitations period of ten years, the last day of which is commonly known as the "Collection Statute Expiration Date" or "CSED."  See 26 U.S.C. § 6502(a).  But, that ten-year limitations period is tolled while any offer-in-compromise is pending, plus 30 days after the IRS rejects that offer.  See 26 U.S.C. § 6331(k)(1) (when an offer in compromise is pending, and

for 30 days after any rejection, the IRS may not levy against those unpaid taxes); 26 U.S.C. § 6503(a)(1) (the CSED is tolled for any period during which the IRS may not levy).

In an effort to satisfy his alleged obligations, as asserted by the IRS, Hulick made three separate offers-in-compromise. The IRS rejected each offer. But, as noted above, each offer effectively tolled the applicable limitations period while it was pending. The IRS's most recent calculation of the tolling periods and the CSEDs is set forth in the government's reply memorandum and involves the interplay of three federal statutes. See Government's reply (document no. 35) at 4-8.

In December of 2006, Hulick again met with the IRS to discuss settling the claims. The IRS's representatives acknowledged that the claims against him had been pending for many years, and expressed their commitment to try to finally resolve the matter. By letter dated December 19, 2006 (the "December Letter"), the IRS provided Hulick with a written calculation of the Collection Statute Expiration Date for each of the assessments for which he was allegedly liable. According to that letter, "[t]he earliest collection statute will expire August 8, 2008 and the last statute will expire October 1, 2008." Exhibit A, Amended Answer (document no. 33-1) (emphasis

supplied).  The December Letter went on to state that, based upon
financial information Hulick had recently provided, the IRS
determined that "he could afford to pay $3,147.00 per month
toward his tax obligation," and "if he takes no action to resolve
the account, [the IRS] will take action to collect the balance
due."  Id.  The IRS also said it wanted him to "remit his equity"
in his family's home.  Id.  Hulick administratively appealed the
finding that he could afford to pay the IRS approximately $3,200
per month.  He lost that appeal when the IRS concluded (without
any explanation) that he could actually afford to pay more:
$4,058 per month.

    Like Falstaff, Hulick perhaps recognized at that point that
"the better part of valour is discretion."[1]  He acquiesced and
began making monthly payments of approximately $4,100.  He
dutifully submitted each monthly payment through what the IRS had
assured him was the expiration of the last limitations period.
At that point, he says he believed his obligations to personally
repay the companies' debts had been met to the IRS's
satisfaction, and all relevant collection statutes had expired,
putting an end to the matter, as agreed.

--------

    [1]    William Shakespeare, Henry IV, Part 1, Act 5, Scene 4
(circa 1597).

What was [of] particular [significance] to me was that
the letter was explicit in its monthly payment
requirement, 3,000 some odd dollars every month.  The
CSED runs out October 2008.  So for me, it was very
clear.  They want these payments, and that's my primary
responsibility.

I appealed the payment because it was too high, in my
opinion.  That did not go well for me.  Two things
happened: One, the IRS levied my wages in January, and
two, the appeal was overturned and inexplicably, the
monthly number was raised to over $4,000 a month.

So, at this point, I said, David, just pay.  Don't ask
questions.  They know where you are.  If they want the
house, they will come and tell you what they want.  I
took that [reference by IRS agents to the existence of
equity in Hulick's house] to be the threat of what
would happen if I did not conform [and make the monthly
payments].  I don't know.  Was the thousand dollars on
top of that [i.e., the increase from roughly $3,100 to
$4,100], was that to reflect the home equity?  It was
not explained to me.  And I was, frankly, not
comfortable going back and asking because the last time
I did so, it didn't go so well for me.  But please also
keep in mind that the IRS knew I was out there because
every month, Mary Byars received an envelope from me
addressed to her personally with a $4,000 check in it.
So I knew, guys, you know I'm here, you know I'm doing
what the [December Letter] says.  I'm sure when you
want something, you'll let me know.

I can tell you when October came, it was a wonderful
day.  It's over.  I've discharged my responsibility.  I
did what they told me to do.

Hulick Deposition at 106-07.  Not surprisingly (given this

litigation), the IRS did not share Hulick's view.


By form letter dated November 5, 2008, the IRS notified

Hulick that, according to its calculations, he still owed more

than $2 million.  The IRS also informed Hulick that the

Collection Statute Expiration Dates it had previously determined
and represented to be accurate, at least implicitly, in the
December Letter, were inaccurate.  After reviewing the file and
re-calculating the relevant tolling periods, the IRS now informed
Hulick that the CSEDs actually ran until at least July of 2009.
In other words, the IRS told Hulick that in its view he still
owed a substantial sum of money <u>and</u>, because the relevant
limitations periods had not yet expired after all (contrary to
its prior representations), it was still free to collect those
sums from him.

     Hulick was, of course, surprised to learn that the
government had, from his perspective, dramatically changed its
position.  Hulick thought the IRS had agreed that his personal
obligations would be considered fully discharged if he made the
required monthly payments of $4,100 through the end of October,
2008.

          The lawsuit was an absolute mind blower.  I just - I
          have no expectation, no understandings.  I had - they
          told me what they wanted from me explicitly, pay this
          amount.  This is the [drop] dead date.  And I did it.

Hulick Deposition at 107-08.  When asked whether he believed the
December Letter (in which the IRS first established - and
subsequently raised - its monthly payment demand, and explained

9

that the statute of limitations (CSED) expired in October of 2008) was a contract between him and the IRS, Hulick testified:

> Yes.  And please understand, it was not a contract in the sense that there's an exchange.  We were not equals.  They had shown me in January, if you don't do what we like, we will levy your wages.  So it was – I was under the threat of a levy and I also knew they had threatened me with a lawsuit.  So I was going to make sure that those checks were always paid, always on time.
>
> * * *
>
> When I went to them in December [of 2006], I said, I would like to have a deal, I would like to have something concrete so I can put this behind me.  And the [December] letter, if you look through the whole history of the correspondence, that's the only personal letter I've gotten from the IRS.  So it was pretty important to me.  They put some effort into that. . . . It wasn't a form letter.  That was the only nonform letter I got, so it was important to me.
>
> So I get to that day, I make the last payment, and I get a form letter, we're going to levy your wages.  You need to remit $2 million to the IRS.  I talked to my attorney in May, who lived in North Carolina, I said, there's a mistake.  I did [everything they asked].
>
> So he writes them a letter and the next thing I know, I get an envelope from the Department of Justice.  My wife and I are being sued.  There was no call, there was no follow-up.  I was astonished.  I went in [in 2006], and they say, we'll take care of this.  They give me the [December] letter.  I did what they said, and then I get a form letter and a lawsuit.  That's not right.

Hulick Deposition at 108-110.

Hulick's sense that he has not been treated fairly by the IRS is understandable.  It was reasonable for Hulick to think that the IRS had: (1) properly calculated the relevant CSEDs; and (2) led him to believe that if he complied with the demand that he pay $4,100 each month to the IRS through October of 2008 (the last CSED), his personal obligations would be considered fulfilled.[2]

Also understandable is Hulick's frustration at his government's too casual characterization of the record, and its failure to distinguish between Hulick's <u>historical</u> authority at Precision and his <u>actual</u> authority during the tax quarters in question.  <u>Compare</u> Government's Motion for Summary Judgment (document no. 50-1) at 6-7 <u>with</u> Hulick Deposition.  <u>See generally</u> Defendant's Objection (document no. 57-1) at 3-5 (pointing out,

---

[2]    The December Letter requests Hulick to "begin to make voluntary payments toward the tax obligation [i.e., the $4,100 monthly payments] and says that if he "takes no action to resolve the account, [the IRS] will take action to collect the balance due.  This may include issuing levys and recommending that a suit be filed."  December Letter (document no. 30-2) at 2.  Hulick plausibly asserts that the implication of that letter is clear: if he failed to take action, he would risk being sued; if, on the other hand, he complied with the IRS's demand for voluntary payments through the end of the fixed limitations period, his obligations would be considered fulfilled and the IRS would forgo filing suit against him for any (claimed) unpaid balance.  The IRS certainly did not candidly inform him that the periodic monthly payments were expected to be made, and, before the relevant CSEDs, the IRS would then file suit for the claimed balance.

with record citations, the several misstatements or, at worst, mischaracterizations in the government's memorandum).

For its part, the government acknowledges that IRS agents gave Hulick incorrect CSEDs, and it does not seriously dispute that he relied on those dates.  Nevertheless, the government says it is not bound by those miscalculations and negligent misrepresentations, even though Hulick plainly relied on them in making the "voluntary" monthly payments demanded by the IRS. And, more critically for Hulick, the government says his uninterrupted and timely monthly payments of $4,100 through the misrepresented CSEDs did not resolve his alleged personal obligation to the IRS, which the IRS claims still exceeds $2 million.

## Discussion

I.   <u>"Responsible Person" Under the Internal Revenue Code</u>.

The Internal Revenue Code "requires employers to withhold from their employees' paychecks money representing employees' personal income taxes, unemployment insurance and social security taxes that those employees owe or will owe the government."  <u>In re Energy Resources Co.</u>, 871 F.2d 223, 225 (1st Cir. 1989).  The employer holds the withheld monies in trust for the United States, and is responsible for remitting them to the Internal

Revenue Service.  Once those funds are withheld from an employee's wages, the IRS has no recourse against the employee - even if the employer fails to turn them over to the IRS.

The Code also "imposes personal liability not only upon employers but upon their officers and agents who are responsible for collecting, accounting for, and paying over to the government the taxes withheld."  Thomsen v. United States, 887 F.2d 12, 14 (1st Cir. 1989).  See generally 26 U.S.C. § 6672.[3]  The statute imposes upon "responsible persons" what is commonly known as the Trust Fund Recovery Penalty.  And, because tax assessments are presumed to be correct, the person against whom such a penalty is imposed bears the burden of proving, by a preponderance of the evidence, that he or she is not a "responsible person" under section 6672.  See, e.g., Jean v. United States, 396 F.3d 449,

_____

[3]     Section 6672 of Title 26 of the United States Code provides that:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a) (emphasis supplied).

454 (1st Cir. 2005); <u>Brinskele v. United States</u>, 88 Fed. Cl. 334,

339 (Fed. Cl. 2009).


Precision, NERA, and at least some of the related companies

identified in the government's complaint failed to remit

withholdings that each made from employees' wages.  The critical

question in this litigation is, then, whether Hulick was a

"responsible person" with regard to any of those companies during

the tax quarters in question.  If he was, he is personally liable

to the IRS for the Trust Fund Recovery Penalties imposed by 26

U.S.C. § 6672.


In determining whether someone is a "responsible person"

under section 6672, courts consider several factors.

> In determining who falls within the category of
> responsible person, the courts have identified seven
> typically used, but nonexclusive, indicia.  The inquiry
> focuses on whether the individual "(1) is an officer or
> member of the board of directors, (2) owns shares or
> possesses an entrepreneurial stake in the company, (3)
> is active in the management of day-to-day affairs of
> the company, (4) has the ability to hire and fire
> employees, (5) makes decisions regarding which, when
> and in what order outstanding debts or taxes will be
> paid, (6) exercises control over daily bank accounts
> and disbursement records, and (7) has check-signing
> authority."

<u>Vinick v. United States</u>, 205 F.3d 1, 7 (1st Cir. 2000) (quoting

<u>Fiataruolo v. United States</u>, 8 F.3d 930, 939 (2d Cir. 1993)).

Importantly, however, "[t]o trigger § 6672 liability, a person must have <u>significant</u> <u>decision-making</u> <u>authority</u> over the corporation's tax matters.  A person's <u>technical</u> <u>authority</u> to sign checks and duty to prepare tax returns are not enough to make the person responsible under the statute."  <u>Barton v. United States</u>, 988 F.2d 58, 59 (8th Cir. 1993) (emphasis supplied).  The purpose of Section 6672 is "to hold liable for the nonpayment of withholding taxes the party responsible for such payment."  <u>Vinick</u>, 205 F.3d at 8.  Accordingly, the "crucial inquiry is whether the person had the '<u>effective power</u>' to pay the taxes – that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed."  <u>Id</u>. (quoting <u>Barnett v. IRS</u>, 988 F.2d 1449, 1454 (5th Cir. 1993)) (emphasis supplied).  <u>See also</u> <u>Moulton v. United States</u> 429 F.3d 352, 357 (1st Cir. 2005) ("[T]he central question in determining whether a taxpayer is a responsible person is whether he had the power to pay the taxes during the quarters in question.") (quoting <u>Vinick</u>, 205 F.3d at 10); <u>Hochstein v. United States</u>, 900 F.2d 543, 546–47 (2d Cir. 1990) ("whether an individual is responsible for the payment of a corporation's withholding taxes depends primarily on the factual question of the degree of control he exercises over the corporation's finances.").

Here, whether Hulick had the authority to pay the taxes at issue — whether he possessed the requisite degree of control over the companies' resources during the relevant period — is plainly a genuinely disputed issue of material fact.  Careful consideration of the seven factors identified above fails to conclusively settle, as a matter of law, whether he is properly viewed as a "responsible person" during the tax quarters at issue.  For example, Hulick's job title suggests he was an officer of Precision and NERA.  But he was not on the board of directors; he had no equity or legal ownership interest in either corporation; he did not invest in either corporation, and he held no stock.  He was involved in the routine day-to-day management of some of the affairs of the companies, but he says critical management decisions during the quarters at issue were made by the companies' equitable and legal owners, and Hulick's corporate superiors, Allyn Caruso and John Gallichon.  He had some limited ability to hire employees within the accounting department, but Gallichon was "the main person" with authority to hire and fire employees.  Prior to what Hulick referred to as the "crisis situation of 1993 and 1994," he had some authority to determine (or at least suggest to Gallichon) which creditors should be paid; but, he testified that such authority lapsed during the "crisis situation" when the companies were struggling to survive.  And, finally, prior to the "crisis situation," Hulick exercised

16

some management control over bank accounts and disbursement
records and he had check signing authority, but the companies'
payroll was actually administered by a third party (even though
each check went out under a facsimile of Hulick's signature).

The critical - and unresolved - factual question is this:
Did Hulick have the ability/authority to prevent the companies'
tax defaults from occurring during the tax quarters at issue?
Noting that the past is often prologue, the IRS points out that
Hulick had, historically, been vested with such authority.  And,
as the IRS correctly asserts, historic evidence of that sort is
certainly relevant evidence.  See Vinick, 205 F.3d at 11, n.8
("We do not mean to suggest that in all § 6672 cases a district
court is precluded from considering evidence from outside the
quarters in question.  For example, behavior in one quarter,
depending on the circumstances, could cast light on one's status
as a responsible person in other quarters.").  See also Moulton,
429 F.3d at 357 ("[The taxpayers'] argument suggests that
evidence outside a particular quarter may not be used to
establish liability for that quarter.  Such a rule would not be
sensible and is not the law of this circuit.").

But, simply because Hulick may have once had the authority
to ensure that employee withholdings were remitted to the IRS in

17

a timely manner hardly compels the conclusion that he had the same authority to allocate corporate-controlled money during the period of time at issue in this case.  See Vinick, 205 F.3d at 11, n.8 ("Because one's function and status can change between quarters, however, it would be erroneous based solely on evidence from one quarter automatically to conclude that a person is responsible in another quarter.").  Moreover, Hulick specifically testified that during the "crisis situation" of 1993-1994, he lacked authority to determine which creditors (including the IRS) would be paid with scarce money under his corporate employers' control (probably for very pragmatic reasons, since it wasn't his company that was failing).  See, e.g., Hulick Deposition at 42-43; 77.  In fact, Hulick testified that if he had tried to remit the withholdings in question to the IRS without Gallichon's express authorization, he likely would have been fired.

> Question: During the crisis time, what would have happened if you had tried to pay creditors [including the IRS] without Mr. Gallichon's authority?
>
> Answer:   Well, I would answer that in two parts.  One, he made his expectation clear that he wanted to be consulted on all major payments, and I assumed he would have dismissed me if I had taken the initiative to start running things.

Id. at 79.  See also Id. at 43 ("[T]here was no point in time where I could have gone in and said, okay, I'm going to clean this up today and do it whether Gallichon or Caruso want to or

18

not."); Id. at 80 ("There was no systematic process [to determine who got paid when there wasn't enough money to pay every creditor].  It was discussed in the VP meetings, which meant that all the key operational people had a chance to comment on what they needed to continue the operation and safety element, and in the end, Mr. Gallichon would then make the decision as to what was done.").

As currently developed, the record reveals that in the fall of 1993 the two owners of Precision and NERA - Allyn Caruso and John Gallichon - decided that, as a matter of corporate policy, the companies would prioritize payments to creditors, giving preference to those responsible for aircraft safety and maintenance over the Internal Revenue Service.  Then, when cash flow had sufficiently improved, the companies intended to bring their obligations to the IRS current (including the payment of fines, penalties, and interest).  That was, to be sure, an unwise policy decision.  But, it was also one the IRS was seemingly willing to tolerate as long as the taxes and penalties were eventually paid.  Needless to say, the IRS was predictably less satisfied with that approach when the companies were not able to remit the full amount that had been withheld from employees' payroll checks during 1993 and 1994.

19

Parenthetically, the court notes that the IRS is no longer seeking to obtain trust fund recovery penalties from Caruso and Gallichon. The IRS pursued Gallichon for the same penalties it seeks to recover from Hulick and eventually settled those claims for an undisclosed amount. As for Mr. Caruso, however, it appears the IRS allowed the statutory collections period to expire before obtaining any recovery at all from him. <u>See</u> United States' Responses to First Set of Interrogatories (document no. 48-35) at 8.

The IRS seeks to hold Hulick personally liable for the companies' outstanding tax obligations because, it asserts, he could have exercised unilateral authority to appropriate funds over which the companies had control in an amount sufficient to pay all the companies' outstanding payroll withholdings obligations. But, as noted above, whether Hulick is properly viewed as a "responsible person" during the tax quarters in question requires resolution of complicated material factual issues regarding his authority and ability to control the expenditure of funds under corporate control during a financially stressful period — issues that are disputed. Consequently, neither party is entitled to judgment as a matter of law.

20

II.  <u>The Government's Motion to Dismiss Hulick's Counterclaim</u>.

The government moves to dismiss Hulick's sole remaining
counterclaim, asserting that it fails to state a viable claim
and, in any event, the court lacks subject matter jurisdiction.
Hulick objects, asserting: (1) this court previously ruled that
his counterclaim for breach of contract adequately sets forth a
viable cause of action; and (2) even if it is barred as a matter
of law as a <u>counterclaim</u> (or the court lacks subject matter
jurisdiction over it), it survives as an affirmative defense.

Hulick's first assertion misconstrues the court's prior
order.  <u>See generally</u> Order dated June 30, 2011 (document no. 42)
("<u>Hulick I</u>").  In that order, the court noted that neither party
had addressed the court's charitable construction of Hulick's
counterclaim: <u>i.e.</u>, that Hulick said the government had, in
essence, entered into a settlement agreement with him, that he
had performed his obligations under that agreement, and that he
now sought to enforce the government's alleged promise not to sue
him.  Accordingly, the court held that "the parties should have
the opportunity to engage on those specific issues and brief
their respective positions."  <u>Id</u>. at 15, n.2.  Contrary to
Hulick's suggestion, the court did not hold that his
counterclaim, even charitably construed, stated a viable cause of

action.  It merely noted the obvious — that the parties had not
yet adequately briefed the issue.

     But, the government, too, seems to be somewhat off the mark
in its arguments.  If, in his counterclaim, Hulick were seeking
an award of <u>money damages</u> against the government in excess of
$10,000, the government would be correct in pointing out that
this court lacks jurisdiction over such a claim.  <u>See</u> 28 U.S.C. §
1491(a)(1) and 29 U.S.C. § 1346(a)(2).  <u>See generally</u> <u>McGuire v.
United States</u>, 550 F.3d 903, 910-11 (9th Cir. 2008) ("Read
together, these statutes provide for jurisdiction solely in the
Court of Federal Claims for Tucker Act claims seeking more than
$10,000 in damages, and concurrent district court jurisdiction
over claims seeking $10,000 or less.").

     But, Hulick is no longer seeking money damages.  Instead, he
asserts that he and the government entered into a contract or
settlement agreement, pursuant to which the government agreed not
to sue him if he made regular and timely monthly payments of
roughly $4,100, through the expiration of the limitations periods
as represented by the IRS.  Hulick seeks the <u>equitable</u> remedy of
specific performance or, alternatively, relief in the nature of
an injunction or estoppel preventing the government from
asserting that he owes any additional funds on behalf of

Precision or NERA as a "responsible person."  And, as before, the
government has inexplicably failed to address that claim.  <u>See</u>
<u>Hulick I</u>, slip op. at 15 ("The government has not, however,
asserted that Hulick cannot bring an action to specifically
enforce the (alleged) settlement agreement with the IRS nor has
it briefed that issue.  Consequently, the court concludes that
dismissal (or transfer to the Court of Claims) of Hulick's breach
of contract claim is, at least at this juncture, premature.").
To the extent the government suggests that this court lacks
jurisdiction to award the non-monetary relief Hulick seeks, that
argument would seem to lack merit.  But, at the risk of
repetition: <u>it</u> <u>has</u> <u>not</u> <u>been</u> <u>adequately</u> <u>briefed</u>.[4]

---

[4]      In its brief, the government casually asserts that
"[b]oth the Tucker Act and the Little Tucker Act forbid equitable
relief in contract actions against the United States."
Government's memorandum (document no. 67-1) at 2.  The government
provides very little legal support for that thesis but, even
assuming it is a correct statement of federal law, it does not
answer the broader question of whether any <u>other</u> federal statute
vests this court with jurisdiction over Hulick's request for
equitable relief.  <u>See, e.g.</u>, 5 U.S.C. § 702 ("A person suffering
legal wrong because of agency action, or adversely affected or
aggrieved by agency action within the meaning of a relevant
statute, is entitled to judicial review thereof.  An action in a
court of the United States seeking relief other than money
damages and stating a claim that an agency or an officer or
employee thereof acted or failed to act in an official capacity
or under color of legal authority shall not be dismissed nor
relief therein be denied on the ground that it is against the
United States or that the United States is an indispensable
party.").

Moreover, even if he cannot prove that he had a contract with the government (or, as he claims, that the government entered into a "covenant not to sue" him), Hulick has one final arrow in his quiver: an affirmative defense, in which he asserts that the government is, based on the misrepresentations made by its agents, at least estopped from collecting any additional alleged tax deficiency for which Hulick might be liable.  <u>See</u> Amended Answer and Counterclaims (document no. 33) at 3.  Whether claims of estoppel ever properly lie against the government is a question subject to substantial debate.  <u>See, e.g.</u>, <u>Office of Personnel Management v. Richmond</u>, 496 U.S. 414, 421-24 (1990). The Supreme Court left that issue unresolved.  <u>See</u> <u>Id</u>. at 423 ("[W]e need not embrace a rule that no estoppel will lie against the Government in any case in order to decide this case.  We leave for another day whether an estoppel claim could ever succeed against the Government.").

The government has not demonstrated that Hulick's affirmative defense of estoppel is subject to dismissal (or that it would be appropriate to strike that affirmative defense). <u>See, e.g.</u>, <u>InvestmentSignals v. Irrisoft</u>, Case no. 10-cv-600-SM, slip op. at 2 (D.N.H. Aug. 1, 2011) (discussing the distinction between "dismissing" a counterclaim, and "striking" an affirmative defense).  Whether Hulick will be able to sustain his

24

substantial burden of proof as to that defense, however, remains
to be seen.  See generally United States Pub. Interest Research
Group v. Atl. Salmon of Maine, LLC., 215 F. Supp. 2d 239, 259-60
(D.Me. 2002) ("A defendant raising equitable estoppel against the
government must show that the government engaged in 'affirmative
misconduct.'  At a minimum, the government official must have
intentionally or recklessly misled [the defendant].  Mere
negligence does not rise to the level of affirmative
misconduct.").  Here, the IRS agents may well have been merely
incompetent or negligent.  But, given this record, a finding of
"recklessness" would not be without evidentiary support.


### Conclusion

Whether Hulick is personally liable for trust fund recovery
penalties turns on whether he had actual authority, during the
tax quarters in question, to decide which of the companies'
creditors would be paid, and which would not.  The government has
yet to identify any direct evidence of such authority, choosing
instead to rely on inferences arising from evidence suggesting
that Hulick possessed sufficient authority in earlier tax
quarters.  The government says that it is reasonable to infer
from Hulick's prior authority that he retained that authority
during the "crisis period" of 1993-1994.  As noted above,
however, while such evidence is relevant, it is not dispositive -

a person's role in a company, as well as his or her authority,
can certainly change over time.

    For his part, Hulick is not entirely clear on that point
either.  At times, his deposition testimony was unequivocal and
he clearly stated that he lacked the authority to determine
whether (or when) the employee withholdings would be remitted to
the IRS.  See, e.g., Hulick Deposition at 43 ("[T]here was no
point in time where I could have gone in and said, okay, I'm
going to clean this up today and do it whether Gallichon or
Caruso want to or not.").  At other times, however, his testimony
was more ambivalent.  See, e.g., Id. at 77 (In response to the
question, "Who was in charge of paying bills for the seven
airline companies?" Hulick testified that, "In the normal course
of business, the - I'd work with the accounting department to
handle the cash flow.  In a crisis situation, Mr. Gallichon was
very much involved in determining who got what.").  Of course,
that Mr. Gallichon was "very much involved" in those decisions
does not mean that Hulick lacked the authority to make them
himself.  Presumably, however, Hulick's testimony at trial on
that point will be clarified during the examination process.

    For the foregoing reasons, the Government's Motion for
Summary Judgment (document no. 48), the Defendant's Motion for

Summary Judgment (document no. 50), and the Government's Motion to Dismiss (document no. 67) are all denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
District Judge

December 7, 2011

cc:  Andrea A. Kafka, Esq.
     Patrick B. Gushue, Esq.
     Daniel E. Will, Esq.
     Joshua M. Wyatt, Esq.
     Charles H. Bradley, III, Esq.
     Richard J. Lavers, Jr., Esq.